MacLachlan Law Offices LLC
Saddle River Plaza II, 2 Park Way
Upper Saddle River, New Jersey 07458
(201) 236-0468
Attorneys for Plaintiffs

| | |
|---|---|
| SCOTT A. ECKENHOFF,<br>DEBRA A. ECKENHOFF,<br>ECKENHOFF BUICK PONTIAC GMC<br>CADILLAC, INC.,<br>ECKENHOFF SHOWCASE, INC.,<br>E CUBED, LLC,<br><br>          Plaintiffs,<br><br>v.<br><br>ALLY FINANCIAL, INC, (AS THE<br>SUCCESSOR IN INTEREST OF AND<br>FORMALLY KNOWN AS GMAC, INC.,<br>GMAC FINANCIAL SERVICES, LLC.,<br>GMAC LLC, and GENERAL MOTORS<br>ACCEPTANCE CORPORATION),<br><br>          Defendant. | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION NO:<br><br><br><br>**COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs, Scott A. Eckenhoff, Debra A. Eckenhoff, Eckenhoff Buick Pontiac GMC Cadillac, Inc., Eckenhoff Showcase, Inc., and E Cubed LLC, by their attorneys, MacLachlan Law Offices LLC, complaining of the Defendant, respectfully allege as follows:

### The Parties

1.    Plaintiff Scott A. Eckenhoff is an individual residing at all relevant times in the State of New Jersey. Mr. Scott A. Eckenhoff is President, CEO, and at all relevant times was a

majority shareholder of Eckenhoff Buick Pontiac GMC Cadillac, Inc., and Eckenhoff Showcase, Inc.

2.   Plaintiff Debra A. Eckenhoff is an individual residing in the State of New Jersey. Mrs. Debra A. Eckenhoff is a member of Plaintiff E Cubed, LLC.

3.   Plaintiff Eckenhoff Buick Pontiac GMC Cadillac, Inc. ("Eckenhoff Jenkintown") is a corporation organized under the laws of the State of Delaware, previously operating a motor vehicle dealership business located at 1750 The Fairway, Jenkintown, Pennsylvania 19046 and 816-830 Old York Road, Jenkintown, Pennsylvania, 19046.

4.   Plaintiff Eckenhoff Showcase, Inc. ("Eckenhoff Showcase") is an S Corporation, organized under the laws of the State of New Jersey, previously operating a pre-owned motor vehicle dealership business located at 481 Route 38, Maple Shade, New Jersey 08052.

5.   Plaintiffs "Eckenhoff Buick Pontiac GMC Cadillac, Inc." and "Eckenhoff Showcase, Inc." are referred to collectively as the "Eckenhoff Dealerships".

6.   Plaintiff E Cubed, LLC is a limited liability corporation, organized under the laws of the State of New Jersey, in which Mr. Scott A. Eckenhoff and Mrs. Debra A. Eckenhoff are the sole members.

2

7.    Defendant Ally Financial, Inc. (as the successor in interest of and formerly known as GMAC, Inc., GMAC Financial Services LLC, GMAC LLC, and General Motors Acceptance Corporation) is a Delaware Corporation, with a principal place of business in Detroit, Michigan, and conducted business in the State of New Jersey and the Commonwealth of Pennsylvania in connection with the transactions that are the subject of this action. (Defendant is referred to herein as "GMAC".)

## Jurisdiction and Venue

8.    The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as this Court has original jurisdiction of all civil actions wherein the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States, and each of the Defendant entities has sufficient contacts with the State of New Jersey to satisfy the jurisdictional requirements.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)(1),(2),(3).

## Facts Common to All Counts
### A. Summary

11.    This is an action against GMAC arising from its bad faith conduct in executing an undisclosed nationwide scheme to

address its own internal liquidity crisis by targeting its commercial customers, specifically the Eckenhoff Dealerships and numerous similarly situated automobile dealerships, for termination, foreclosure and vehicle inventory liquidation, in violation of the Uniform Commercial Code, the New Jersey Consumer Fraud Act, Common Law, and in flagrant derogation of its contractual obligations.

12. As GMAC's internal liquidity crisis worsened, GMAC began to prey upon its customers, the automobile dealerships. As part of an overall scheme, GMAC commenced a deliberate process of demanding unwarranted changes to long standing business practices in order to extract as much cash as possible from GMAC's daily transactions with the dealerships.

13. A critical part of GMAC's scheme to address its liquidity crisis, at the expense of its customers, was to target certain dealerships for financial pressure tactics and closure so that dealership cash, assets, and vehicle inventory could be liquidated by GMAC and desperately needed cash infused into GMAC.

14. GMAC formulated and executed a scheme whereby GMAC would manufacture a "financing default" by the dealership and then threaten to terminate all financial services and products GMAC provided to the dealership, unless the dealership entered into an unconscionable forbearance agreement. The GMAC

4

forbearance agreement was thereafter used by GMAC to extract even more cash, collateral, and assets from any dealership misled into signing the unconscionable forbearance agreement.

15.   GMAC misled the targeted dealers into the mistaken but reasonable belief that, if they acceded to GMAC's demands, GMAC would continue to provide the financial services and products essential for the dealership to stay in business.

16.   GMAC never disclosed to the targeted dealers that once GMAC had "discovered" the alleged default, and even if the dealership agreed to sign the unconscionable forbearance agreement, GMAC had no intention of allowing the targeted dealerships to survive, even if the dealership did everything reasonably possible to comply with GMAC's unconscionable demands. Ultimately, and inevitably, it was GMAC's intent to seize and liquidate the largest source of cash possessed by the targeted dealerships, the dealership's vehicle inventory. All wrongful conduct and unconscionable commercial practices of GMAC, and all desperate attempts by the dealerships to comply with GMAC's bad faith demands, were but an orchestrated prelude to the true purpose of GMAC's manufactured "default". The true purpose of GMAC's manufacture and "discovery" of a dealerships "default" was the seizure and liquidation of the dealerships vehicle inventory. Dealership by dealership, GMAC utilized similar and typically wrongful unconscionable commercial

practices to seize and liquidate each dealership's vehicle inventory after harvesting and draining all other available cash, collateral, and assets from the dealership and its owners personally.

17. The cash yield harvested and drained from each dealership by GMAC was impressive. The Eckenhoff Dealerships alone yielded over Eight Million Dollars ($8,000,000.00) in cash to GMAC when the dealership vehicle inventory was liquidated. Upon information and belief, in a similar and typical manner, GMAC liquidated the vehicle inventories of upwards of one thousand (1,000) automobile dealerships nationwide as part of this scheme to infuse cash into GMAC. In addition to wrongfully seizing the cash, collateral and assets, of the dealerships and its owners personally, GMAC also demanded the dealership and its owners pay penalty fees and reimburse GMAC for the costs and any shortfalls in recovery of vehicle value associated with GMAC's wrongful, ill advised, commercially unconscionable and inefficient liquidation of the vehicles inventories.

18. GMAC abruptly turned its back on the years of business relationships, business customs, and business practices GMAC had used to induce automotive dealerships to accept and utilize GMAC's Wholesale and Retail Financing Services and Products. GMAC demanded, extorted, and imposed increasingly restrictive wholesale and retail financing practices and terms, irrespective

of the years of established business customs and practices and the terms of the financing agreements themselves.

19. GMAC extorted accelerated principle payments, increased interest rates and payments, restricted or refused dealership access to the financial services and products sold by GMAC to the dealership. GMAC demanded additional collateral, penalty fees, and other cash payments from targeted dealers – irrespective of whether the dealers were in default – and made repeated threats that GMAC would terminate the dealers' wholesale and retail financing agreements and seize their entire automotive inventory unless they complied with GMAC's unconscionable commercial practices and demands.

20. GMAC knew that these customers, the targeted automobile dealerships, would continue to reasonably rely upon the expectation that GMAC would continue the long standing established course of dealing with the dealerships. GMAC knew these customers could be misled by GMAC into the mistaken but reasonable belief that, if the dealership accepted GMAC misrepresentations as being made in good faith, and if the dealership acceded to GMAC's demands, GMAC would continue to work with the dealership in good faith to continue providing the financial services and products essential for the dealerships to weather a difficult business economy and stay in business. GMAC took advantage of the dealerships reasonable but erroneous

expectation that GMAC would conduct itself in good faith as it had done in the past.

21.   At all relevant times, GMAC knew that the targeted customers had no alternative source for the Wholesale Financing Services (Floorplan) and Product GMAC had induced the dealers to utilize and rely upon to finance their automobile inventory. During years of favorable business climates, GMAC was anxious for its automotive dealership customers to fully utilize GMAC's Wholesale Financing (Floorplan) Services. Upon information and belief, it was not unusual for the targeted customers to utilize GMAC's Wholesale Financing Services to "floorplan" Five to Ten Million Dollars ($5-10,000,000.00) worth of new and used vehicle inventory at any given time. GMAC also provided each of its customers with access to the computerized "SmartCash" system, a service and product GMAC sold, as the preferred means by which GMAC and the customer would transact business on a daily basis. GMAC encouraged and induced each dealership to "floorplan" finance all the dealership's vehicle inventory with GMAC to the exclusion of any other financial competitor. When GMAC's own internal liquidity crisis arose, GMAC stealthily turned against certain targeted customers, and executed the scheme to seize back the funds GMAC had previously provided to these customers and more.

8

22.  At all relevant times, GMAC knew that by raising the costs and accelerating the payments associated with its Wholesale (Floorplan) Product, and restricting the customers access to the retail financing product (GMAC had for years induced the dealers to rely upon), it was making it more and more difficult for the targeted customers to conduct business profitability and make payments to GMAC. GMAC knew the targeted customers had no choice but to utilize GMAC's Wholesale Financing Product, and that by using GMAC's Wholesale Financing Product, the dealer would become less and less profitable, less and less able to maintain working capital and less able to make payments to GMAC. Once the customer was sufficiently weakened, GMAC could manufacture a "default" and wrongfully seize and liquidate millions of dollars of vehicle inventory.

23.  At all relevant times, GMAC knew, but did not disclose to these customers, that once GMAC had forced the dealers to give GMAC everything they had – and more – GMAC would "discover" an alleged default by the customer to comply with the Wholesale Financing Agreement, and then use the alleged default by the customer as an excuse to (1) seize control of all dealership cash and automotive inventory collateral, (2) cease doing business as usual and physically install a GMAC employee, at the customers expense, in the dealership to control and limit the manner in which the customer was permitted to conduct business

going forward, (3) seize all customer revenues and payments made to the dealership, (4) demand the customer sign an unconscionable "forbearance agreement" intended to formalize the extinguishment of all customer rights and permit GMAC to seize all revenues, assets, and collateral of the dealerships. GMAC's unconscionable commercial practice was to threaten and mislead its customers into signing the unconscionable forbearance agreement in exchange for the false promise of the illusory opportunity to cure and resume business as usual if the dealer made certain wholesale financing payments.

24. At all relevant times, GMAC knew but did not disclose to its customers, that it would ultimately thwart the customers efforts to "cure" (by making the payments demanded by GMAC) and unreasonably thwart and reject all customer efforts to provide reasonable financial alternatives in response to GMAC's unreasonable demands.

25. At all relevant times, GMAC knew but did not disclose to its customers, that it would ultimately terminate its business relationship with the customer, whether or not the customer signed the unconscionable forbearance agreement. GMAC knew in advance that it would inevitably seize all available funds, foreclose upon and liquidate all collateral and put the dealership out of business.

26. The "Eckenhoff Dealerships" were among upwards of one thousand (1,000) similarly situated customers of GMAC, who were targeted, extorted, liquidated, and closed down under this scheme.

**B.  GMAC as Provider of Wholesale Floorplan Financing Product and Services to the GM Dealership Network**

27. GMAC is, and at all relevant times herein was, an automobile financing company, providing wholesale inventory financing products and services for the General Motors Corporation ("GM") dealership network and retail financing products and services for the dealerships to offer consumers who purchased automobiles and trucks from GM dealers. The Wholesale and Retail Financing Products and Services sold by GMAC to the GM dealers were the same, standardized, typical, if not essentially identical products and services for each dealer.

28. GMAC was originally formed in 1919 as a captive financing subsidiary of GM, making credit available for GM dealers across the country on typical, if not materially identical terms, to purchase inventory from GM ("floorplan financing") and also providing financing for retail sales to customers of the dealers. Over the years, GMAC and GM dealerships established a business relationship, course of dealing, customs, and business practices upon which the dealers

relied and GMAC utilized to induce the business loyalty of the GM dealers.

29. GMAC provided wholesale floorplan financing products and services as well as retail financing products and services to a substantial portion of all GM dealers in the United States, including Eckenhoff Jenkintown and Eckenhoff Showcase.

## C. Scott Eckenhoff's Long-Standing Relationship with GMAC and General Motors.

30. The Eckenhoff family began its relationship with General Motors and GMAC in 1966 when Scott Eckenhoff's grandfather, A.G. Eckenhoff, purchased Center City Cadillac, Inc., in Philadelphia, Pennsylvania. The Eckenhoff family operated Center City Cadillac until 1979 when it was sold back to GM. The relationship between the Eckenhoff family and GMAC continued in 1982 when the Eckenhoff family purchased Duncan Buick in Moorestown, New Jersey. The dealership was renamed Eckenhoff Buick, Inc., and was hugely successful.

31. Scott Eckenhoff began working for the Eckenhoff family GM dealerships in 1974. By 1987, Scott Eckenhoff was the general sales manager of the Eckenhoff Buick, Inc. dealership. By 2002, Scott Eckenhoff owned 100% of Eckenhoff Buick, Inc. and the dealership was receiving numerous GM awards and accolades.

32.   Eckenhoff Buick, Inc., was awarded GM's highest award, the "Dealer of the Year" four times, in 2000, 2001, 2002 and 2005.  The dealership was awarded the GM Mark of Excellence from 2000 through and including 2007.  Additionally, Eckenhoff Buick, Inc. was the northeast's number one sales volume leader in 2000 and 2001 and was runner-up from 2002-2005.  In short, Mr. Scott A. Eckenhoff ran a highly successful dealership.

33.   Eckenhoff Buick, Inc. entered into its first floorplan agreement with GMAC and began using the GMAC floorplan financing product on or around 1982 when GMAC was wholly owned by GM.   The  GMAC  floorplan  financing  agreements  were periodically  renewed.  Floorplan  financing  was  the  critical financial mainstay of Eckenhoff Buick's business, and without which it could not operate.

34.   GM was aware of, and took notice of Scott Eckenhoff's success with Eckenhoff Buick, Inc. As a result of his success with  Eckenhoff  Buick,  Inc.,  in  the  spring  of  2004,  Doug Henderson, the area manager for GM, approached Scott Eckenhoff to  gauge  Mr.  Eckenhoff's  interest  in  purchasing  another  GM dealership in nearby Jenkintown, Pennsylvania.  The dealership in question, known as "The Fairway", was a dealership taken back from its owners by "Motors Holding" (a division of GM created to financially assist dealers with the purchase of GM dealerships). The Fairway dealership was in disarray and had suffered from

years of deteriorating sales and deteriorating consumer satisfaction during which the dealership lost millions of dollars. In 2004, The Fairway suffered serious labor problems which resulted in a walkout of its union employees. GM courted Mr. Eckenhoff for several months and convinced him that with the support of the General Motors family, including Motors Holding and GMAC, he was well suited to purchase, regain market share, and turn around the struggling Fairway dealership.

35.  Mr. Eckenhoff, GM, and GMAC were aware that it would take at least several years to turn around the Fairway, but with the support of GM, Motors Holding, and GMAC, he would be able to develop a successful franchise. In late 2004, Scott Eckenhoff agreed to purchase the Fairway dealership.

36.  The purchase of The Fairway, thereafter to be known as Eckenhoff Buick Pontiac GMC Cadillac, Inc., ("Eckenhoff Jenkintown") occurred on December 14, 2004.

37. Eckenhoff Jenkintown was a Motors Holding dealership. At all relevant times, Motors Holding was, and is, a division of General Motors that provides investment capital to help dealers purchase and develop GM dealerships. As majority shareholder in Eckenhoff Jenkintown, Motors Holding elected to utilize a sister company, GMAC, for Eckenhoff Jenkintown's floorplan financing. Mr. Eckenhoff was a minority shareholder of Eckenhoff Jenkintown

and also served as both the President and Dealer Principal of the dealership.

38. Eckenhoff Jenkintown operated its automotive dealership from two properties. The first property was located at 1750 The Fairway, Jenkintown, Pennsylvania and was rented by Eckenhoff Jenkintown from Argonaut Holdings, Inc.. Argonaut Holdings, Inc., is a wholly owned subsidiary of General Motors. The second property was located at 816-830 Old York Road, Jenkintown, Pennsylvania and was also rented by the Eckenhoff Jenkintown dealership from Argonaut Holdings, Inc.

39. In 2005, E Cubed LLC (a New Jersey LLC in which Scott A. Eckenhoff and his wife, Debra A. Eckenhoff, were sole members), purchased 808 Old York Road. This property was contiguous to 816-830 Old York Road, and was part of Scott Eckenhoff's business plan to develop Eckenhoff Jenkintown and increase its overall value. In all, E Cubed, LLC invested approximately One Million Dollars ($1,000,000.00) into the 816-830 Old York Road property.

40. In 2005, Scott Eckenhoff owned, managed and operated both Eckenhoff Buick, Inc. and Eckenhoff Jenkintown. The Eckenhoff Buick, Inc. dealership won the prestigious award of GM Dealer of the Year in 2005. This award is given to the Top GM dealers in the country. Of all the Pontiac, Buick, GMC,

Cadillac, Hummer, Saturn, Chevrolet, and Saab dealers, GM only presents this honor to the top 100 dealers of all its brands.

41. In Mr. Eckenhoff's first year running Eckenhoff Jenkintown, he reduced the dealership's losses by nearly One Million Five Hundred Thousand Dollars ($1,500,000.00). He was successful in beginning the turnaround of the once struggling franchise. On the basis of the dealerships financial performance, GMAC awarded the Eckenhoff Jenkintown dealership GMAC Platinum Dealer status. GMAC's Platinum Dealer status permitted Eckenhoff Jenkintown to enjoy more favorable financial terms than the terms extended to non-platinum dealers.

42. In 2005, Scott Eckenhoff was presented the opportunity to obtain Wholesale Floorplan Financing from Citizen's Bank, a competitor of GMAC, for both Eckenhoff Jenkintown and Eckenhoff Buick, Inc. GMAC convinced Mr. Eckenhoff he should not switch his floorplan financing company and induced Mr. Eckenhoff to remain with GMAC. GMAC induced Mr. Eckenhoff to remain with GMAC based upon the historical course of business dealings between the parties and GMAC's claim that GMAC had always, and would always, provide financing for GM automotive retailers, such as the Eckenhoff Dealerships, during good times and difficult times for the auto industry. Mr. Eckenhoff reasonably relied upon the representations of GMAC's agents when he agreed

to remain with GMAC and to continue using the GMAC Wholesale Floorplan Financing Products and Services.

43. At the times of the acts complained of herein, Eckenhoff Jenkintown and Eckenhoff Showcase financed the purchase of new vehicles from GM, as well as used vehicles, pursuant to the standardized GMAC Wholesale Security Agreement ("WSA"), which was the financial mainstay of the Eckenhoff Dealerships' business. Under the WSA, GMAC was obligated to provide wholesale floorplan financing to Eckenhoff Jenkintown and Eckenhoff Showcase for new vehicles, trade-ins, and used vehicles. GMAC received interest on the amount advanced by GMAC for the purchase of each vehicle until the amount advanced was paid back by the dealer. The wholesale floorplan financing products and services extended by GMAC under the WSA was fully secured by the new/used vehicle inventory, dealership equipment, fixtures, accounts receivable, contract rights, cash, and other assets of Eckenhoff Jenkintown, Eckenhoff Showcase, as well as Mr. Eckenhoff's personal assets and guaranty.

44. In 2005, both Eckenhoff Jenkintown and Eckenhoff Buick, Inc., granted GMAC a security interest and collateral assignment of monies due to the dealership from General Motors. These monies consisted of holdback, warranty, incentives and other funds and credits that General Motors owed to the dealerships. In the ordinary course of business, these monies would be

17

accounted for and deposited into the dealership's Open Account. These funds were the property of the dealerships and could be utilized by the dealerships however they chose.

45. At all relevant times, Mr. Eckenhoff provided, and as wholesale floorplan financer GMAC had access to, all financial information regarding his dealerships, including, but not limited to, Mr. Eckenhoff's personal financial statements.

46. During 2005, Mr. Eckenhoff, E Cubed LLC, and other individuals, continued to invest in the Eckenhoff Jenkintown dealership. In August 2005, Mr. Eckenhoff purchased the sales and service franchise agreement of an existing Hummer franchise and relocated the Hummer franchise to the Eckenhoff Jenkintown dealership.

47. On or around August 2005, Mr. Eckenhoff decided to purchase Motors Holdings' remaining shares of stock in Eckenhoff Jenkintown. On or around August 9, 2005 Mr. Eckenhoff obtained a Two Million Dollar ($2,000,000.00) loan from Susquehanna Bank which he utilized for the purchase of the stock from Motors Holding, Inc. The loan was secured by 919 Church Road as collateral owned by E Cubed, LLC; a Five Hundred Thousand Dollar ($500,000.00) limited guarantee of A. Theodore Eckenhoff, and the personal guaranty of Scott Eckenhoff.

48. On August 9, 2005, Scott Eckenhoff also signed loan documents with Susquehanna Bank to establish a working capital

loan of Four Hundred Thousand Dollars ($400,000.00) to be used as needed to conduct the business of Eckenhoff Jenkintown. This loan was secured by the personal guaranty of Scott Eckenhoff.

49. During the fall of 2005 and winter of 2006, Mr. Eckenhoff's dealerships continued to grow. Eckenhoff Jenkintown continued its turnaround and greatly reduced the amount of losses the dealership experienced prior to Mr. Eckenhoff's takeover.

50. In January 2006, GMAC and GM jointly decided to change both GMAC's procedure for paying retail finance contract proceeds and GM's procedure for paying amounts owed to dealerships for sales incentive programs. Historically, payments for these two separate items were made via paper, or electronically, through a commercial bank. Effective January 23, 2006, both payments would be made electronically through the use of the Daily Settlement Process ("SmartCash") as part of the financial clearing house services all GM dealers were encouraged/required to use for daily transactions with GMAC.

51. From 2005 through 2006 the US domestic market for Buick vehicles was decreasing and single brand Buick dealership stores were struggling nationwide. Mr. Eckenhoff made the business decision to sell his New Jersey Buick dealership, Eckenhoff Buick, Inc., and focus his efforts on the continued development of Eckenhoff Jenkintown and Eckenhoff Showcase.

52. Mr. Eckenhoff completed the sale of Eckenhoff Buick, Inc., in November 2006. While the sale of the dealership was pending, it was determined that Eckenhoff Buick, Inc., and Eckenhoff Jenkintown had fallen behind on certain wholesale financing payments to GMAC..

53. Upon notifying Mr. Eckenhoff that certain payments totaling approximately Eight Hundred Thousand Dollars ($800,000.00) had not yet been made, GMAC continued to provide Eckenhoff with wholesale floorplan financing. The parties entered into a Forbearance Agreement wherein Mr. Eckenhoff was permitted to make the delayed payments by November 15, 2006. GMAC requested and Scott Eckenhoff provided GMAC with additional valuable collateral in exchange for GMAC's assurance that they would continue to provide Eckenhoff with wholesale floorplan financing, including the signing of a cross collateralization agreement for his personal residence, 80 Ark Road, Lumberton, New Jersey.

54. Mr. Eckenhoff timely made all Eight Hundred Thousand Dollars ($800,000.00) in delayed payments within days of signing the Forbearance Agreement. Eckenhoff Jenkintown continued its floorplan financing with GMAC and business continued as usual with one change. GMAC requested that GM open account funds owed to Eckenhoff no longer be electronically transferred and posted directly from GM to Eckenhoff Jenkintown's account. Instead,

the funds were transferred by GM to GMAC who then, in turn, forwarded the monies to Eckenhoff Jenkintown.   This procedure would end up having serious repercussions for Mr. Eckenhoff in the future when GMAC purposefully withheld the open account funds for an unreasonable amount of time, knowingly causing financial strain and other problems for the dealerships. GMAC would later use this security interest in bad faith as a means to exert critical financial pressure on the Eckenhoff Dealerships.

55.   In May 2007, Mr. Eckenhoff opened Eckenhoff Showcase which was located at 481 Route 38, Maple Shade, New Jersey 08052.   Eckenhoff Showcase was a pre-owned vehicle dealership. Eckenhoff Showcase utilized GMAC as the wholesale floorplan financer for the dealership.   Eckenhoff Showcase entered into a Wholesale Security Agreement with GMAC.   Under the WSA, GMAC was obligated to provide wholesale floorplan financing to Eckenhoff Jenkintown and Eckenhoff Showcase for new vehicles, trade-ins, and used vehicles.   GMAC would receive interest, at a rate determined by GMAC, on the amount advanced to purchase each new and used vehicle until the amount advanced was repaid to GMAC by the dealership.   The floorplan financing extended by GMAC under the WSA was fully secured by the Dealerships' new and used vehicle inventory, equipment, fixtures, accounts receivable, contract rights, cash, and other assets of Eckenhoff Jenkintown,

Eckenhoff Showcase, as well as Mr. Eckenhoff's personal assets and guaranty.

56. At all times, GMAC carefully managed its own security interests in the dealerships vehicle inventories. GMAC constantly monitored the aging status of the vehicle inventories and would routinely request and receive commercially reasonable "curtailment" payments, periodic partial re-payments of the funds advanced by GMAC to finance the individual vehicles. GMAC was responsible for monitoring and maintaining the value of its vehicle inventory collateral so that at all times GMAC would be fully secured by the vehicle inventory.

## Mr. Eckenhoff Invests Significant Funds in the Continued Development of Eckenhoff Jenkintown

57. On December 20, 2006 E Cubed, LLC mortgaged a New Jersey property it owned and loaned Four Hundred Thousand Dollars ($400,000.00) to Eckenhoff Jenkintown for working capital.

58. In June 2007, Mr. Eckenhoff made the business decision to sell his Hummer franchise back to General Motors. At that time, the Hummer franchises were beginning to struggle and GM was attempting to strengthen the Hummer dealership network by reducing the number of Hummer dealerships. Mr. Eckenhoff

invested the profits from the sale of the Hummer franchise into Eckenhoff Jenkintown as working capital.

59.   In the spring of 2008, after Argonaut Holdings, Inc. failed to perform promised environmental remediation at 816-830 Old York Road, Argonaut Holdings, Inc. purchased Mr. Eckenhoff's option to buy 816-830 Old York Road.   This was property that Mr. Eckenhoff originally leased from Argonaut, with an option to buy, when he purchased The Fairway.   Profits from the sale were invested into Eckenhoff Jenkintown as working capital.

60.   Mr. Eckenhoff would not have invested the monies from the sale of 816-830 Old York and the Hummer Franchise as working capital for Eckenhoff of Jenkintown, nor would he have invested other funds, including loans from E Cubed, LLC and others, into Eckenhoff Jenkintown, if he had known of GMAC's undisclosed scheme to liquidate the dealership vehicle inventory and force his dealerships out of business.

## CERBERUS

61.   In April 2006, GM announced a definitive agreement to sell 51% of GMAC to a consortium of investors led by Cerberus Capital Management, LP, a private equity investment firm based in New York City.   The Cerberus/GMAC transaction closed in November 2006.

62. After the closing of that transaction, GMAC experienced financial difficulties that grew more acute under GMAC's new ownership.

63. GMAC financed more than automobiles; it financed residential home mortgages through its Residential Capital Subsidiary, as well as other forms of consumer financing. GMAC grew its mortgage business, ultimately becoming one of the largest sub-prime mortgage lenders in the country.

64. With the collapse of the subprime market in the spring of 2008, GMAC's residential real estate mortgage business was draining GMAC of liquidity and forcing massive losses. GMAC was forced to undertake a $60 billion refinancing for its residential mortgage business in the spring of 2008. However, that was still insufficient to resolve GMAC's internal liquidity crisis.

65. The GMAC liquidity crisis became so acute that, by the fall of 2008, GMAC applied for bank holding company status in order to qualify for an infusion of funding from the Federal Government through the Troubled Asset Relief Program. While GMAC was petitioning the Federal Government for taxpayer assistance under the TARP program, GMAC was duplicitously executing its scheme to wrongfully terminate and liquidate numerous automobile dealership businesses across the United States.

## GMAC Targets Dealerships For Termination

66. In an effort to address its liquidity crisis, GMAC undertook a massive program in 2008 to terminate financing to more than 1,000 GM dealers, stripping those dealers of their associated collateral and closing down their financing, irrespective of whether the targeted dealers were in default.

67. GMAC's program to target selected customers was not disclosed to the dealers. Instead, GMAC affirmatively misled the targeted customers into the belief that, if they acceded to GMAC's demands for accelerated principal payments, increased interest rates, additional collateral, penalty fees, and other cash payments, GMAC would continue to provide financing in accordance with its agreements and the dealers could stay in business.

68. Throughout the implementation of this program, GMAC knew that there were no alternative sources of wholesale floorplan financing available to dealers and that, without GMAC continuing to provide the wholesale floorplan financing under the existing contracts, the targeted customers would be put out of business. This gave GMAC enormous leverage and enabled it to extort the targeted customers with the empty promise that, if the customers surrendered to all of GMACs demands, the customers

would be able to stay in business and weather the business downturn.

69. Throughout the implementation of this program, GMAC knew it had no intention of continuing financing to the targeted dealers, irrespective of whether they were in default, and that GMAC would pull their financing once it had stripped the dealer of all cash, collateral and other assets.

70. GMAC's dealer termination program was implemented through GMAC field personnel, and included the following unconscionable commercial practices which were typically visited in a similar fashion upon all similarly situated customers GMAC had targeted across the United States by:

a. demanding that dealers make accelerated principal repayments for outstanding wholesale floorplan financing;

b. demanding that dealers make accelerated payments on each vehicle sold (i.e., shortening the time for payment of sales proceeds to GMAC to three days from the date of sale when GMAC knew that GM was extending the time for payment of rebates with each sale);

c. demanding interest rate increases and penalties;

d. demanding that dealers increase equity in the business and pledge that new equity as additional collateral;

e. subjecting the dealer to an increasingly burdensome number of inventory audits in an effort to manufacture a default by the dealer;

f. issuing a letter advising targeted dealerships that it had 90 days to find alternative sources of floorplan financing (even though GMAC knew there were no alternatives at that time);

g. demanding additional collateral in the form of assignments of mortgages on dealer plant, property, equipment, personal property, and other assets;

h. threatening to take all of the dealer's inventory and close down all lines of credit unless the dealership signed forbearance agreements, waiving all claims against GMAC and agreeing to significant penalty fees;

i. demanding the assignment of accounts and daily cash sweeps, irrespective of whether funds in the accounts were owed to GMAC or to third parties (i.e., including sales tax);

j. demanding constant floor audits (i.e., placing GMAC representatives in the targeted dealerships and forcing dealerships to pay for them);

k. demanding that dealers turn over possession of all keys and ownership certificates;

l. restricting the dealer's efforts to conduct dealership business profitability, thwarting efforts by the dealer to cure the purported payment shortfalls and unreasonably rejecting or refusing to even consider reasonable financial alternatives proposed by the dealers;

m. ultimately, when all of the possible additional cash and collateral had been pledged to GMAC, engaging in self-help, by taking vehicles off the dealership lot, sweeping any remaining cash, closing down the dealership, foreclosing on mortgages and enforcing all personal guarantees; and

n. placing all seized vehicles in open lots, where they were often damaged, and then sold at bargain basement auction prices, and charging dealerships for any shortfall.

71.  These GMAC demands represented an abrupt departure from GMAC's long standing customs, business practices and the business relationship reasonably relied upon by its dealership customers over the preceding years.

72.  None of the demands made by GMAC were supported by the terms of the standard, typical, GMAC Wholesale Security Agreement, which contained no payment time frame requirement on new vehicle sales, no specified debt/equity requirement, no additional collateral requirement, and no specified profitability requirement. **(Exhibit A: Wholesale Security Agreement - Jenkintown) (Exhibit B: Wholesale Security Agreement - Showcase)**

73.  By improperly terminating the dealers' financing and seizing their vehicle inventory, GMAC caused the closure of perhaps a thousand GM dealers on their "hit list," thus substantially reducing GMAC's ongoing funding obligations irrespective of whether the targeted dealer was in default under the GMAC Wholesale Security Agreement. GMAC's scheme also improved GMAC's liquidity by swiftly converting dealer inventory

collateral to cash, and sweeping in huge fines, increased interest, other purported fees, charges, and foreclosure proceeds.

74. Under GMAC's scheme to improve its liquidity position, dealers throughout the GMAC network, including the Eckenhoff Dealerships, found themselves extorted, their inventory liquidated, and then put out of business as a result of GMAC's bad faith conduct and unconscionable commercial practices.

## GMAC Targets the Eckenhoff Dealerships for Termination

75. In April of 2008, GMAC began to double the number of inventory audits conducted at Eckenhoff Jenkintown and Eckenhoff Showcase. Whereas GMAC previously conducted audits of the dealerships on a bimonthly basis, GMAC was now auditing the Eckenhoff Dealerships on a weekly basis. In fact, at times GMAC conducted audits of the dealerships only three business days apart. The frequency and timing of the audits were intended to result in GMAC's "discovery" of a default. The Eckenhoff Dealerships passed all of the audits and made all payments for vehicles as requested by GMAC.

76. In May of 2008, GMAC raised the bar in its harassment of the Eckenhoff Dealerships. Not only was GMAC conducting weekly audits, GMAC began to withhold the GM open account funds that were owed to the Eckenhoff Dealerships. These open

account funds paid by General Motors to the dealerships were an important source of available cash for the dealers, especially during a business downturn. GMAC's failure to promptly release these funds to the Eckenhoff Dealerships represented an intentional departure from GMAC's ordinary course of business with the Eckenhoff Dealerships. Open account payments of May 15, 2008, May 22, 2008 and May 29, 2008, totaling $88,991.51, were withheld by GMAC and not released to the Eckenhoff Dealerships until June 2, 2008. This created hardship on the dealerships and constricted its cash flow. Despite GMAC's bad faith actions, the dealership continued to pass all audits and made all payments requested by GMAC in a timely manner.

77. Nevertheless, on May 21, 2008, one day after successfully completing yet another GMAC audit, Todd Paulus, Director of Sales for GMAC, called Scott Eckenhoff and asked to meet him that same day. At the meeting, Mr. Eckenhoff was shocked as the GMAC representative Todd Paulus, began to express "concern about the present state of affairs" at the Eckenhoff Dealerships and expressed less confidence that the Eckenhoff Dealerships would be able to re-pay GMAC for the vehicles sold by the Dealerships. Mr. Paulus seemed to be oblivious of the fact the dealership was being constantly audited by GMAC and was making all payments requested by GMAC. By letter of May 27, 2008, received on May 28, 2008, GMAC notified Mr. Eckenhoff that

GMAC had decided to cut off the wholesale and retail financing necessary for the dealerships to remain in business. This was the typical first step taken by GMAC in the scheme to ultimately seize and liquidate the dealership vehicle inventory.

78.   The May 27, 2008 letter from GMAC to Mr. Eckenhoff stated that GMAC was "very concerned" with its "confidence in the collectability and payment of your outstanding indebtedness." The letter also stated that the dealership faced a "critical cash position". GMAC's concerns were unfounded. The Eckenhoff Dealerships were timely on all payments and had just undergone successful audits the day before.  The dealership was continuing to meet its obligation to GMAC despite the business downturn of historic proportions.  Despite the fact that the Eckenhoff Dealerships had not violated any term in its agreements with GMAC, GMAC was giving Mr. Eckenhoff 90 days to find alternate financing, during a business downturn, when GMAC was aware that alternate financing was all but impossible to find due to GM own well publicized financial difficulties.

79.   In addition to pulling the floorplan financing in ninety (90) days, the letter from GMAC threatened Mr. Eckenhoff with substantial "noncompliance" fees if the millions of dollars in fully secured floorplan financing were not paid off within the ninety day period.  As an additional insult, GMAC increased

the Eckenhoff Dealerships interest rate on wholesale lines of credit during that ninety day period.

80.    At all times, the Eckenhoff Dealerships were in compliance with the terms of all agreements and made all payments under those agreements as and when due. When GMAC made these demands and threats the Eckenhoff Dealerships were meeting their obligations to GMAC despite the business downturn. Moreover, none of the GMAC loan agreements required the Eckenhoff Dealerships to maintain a certain level of profitability or working capital. The Eckenhoff Dealerships were in compliance with all agreements and GMAC had no reasonable expectation that the dealerships would fail to pay any amounts owed to GMAC when due. When GMAC threatened to withdraw financing, the Eckenhoff Dealerships had passed all of GMAC's unnecessary and harassing weekly audits.

81.    GMAC was well aware of the economic conditions facing the automotive industry at the time it threatened to pull the Eckenhoff Dealerships wholesale floorplan financing, and was well aware that it was impossible for dealerships to find alternate floorplan financing for GM vehicles. GMAC's decision to terminate its financing was part of the unconscionable commercial practices designed to pave the way for GMAC to ultimately seize and liquidate the vehicle inventory. GMAC did not care if its willful and wanton conduct forced the Eckenhoff

Dealerships out of business and ruined Mr. Eckenhoff financially. Moreover, many of the dealerships' financial difficulties at this time period were attributable to GMAC's increasingly stringent decisions to squeeze credit and undermine the financial health of dealerships like Eckenhoff Jenkintown and Eckenhoff Showcase.

82. GMAC abandoned its good faith obligations to the Eckenhoff Dealerships and acted in a manner that was coercive, unreasonable and in bad faith of the spirit of the bargain between GMAC and the Eckenhoff Dealerships.

83. At the same time GMAC was acting against Eckenhoff Jenkintown and Eckenhoff Showcase, GMAC was also swiftly moving across the country making similar unfounded demands on numerous similarly situated dealerships, declaring and creating alleged "out of trust" and false default situations and, within weeks, closing dozens of stores as part of the "massive restructuring efforts."

84. Less than one week after receiving the May 27, 2008 letter notifying the dealership of GMAC's plan to pull its wholesale floorplan financing, GMAC continued with its plan of harassing the Eckenhoff Dealerships and attempting to set up seizure of the vehicle inventory. Traditionally, per agreement with GMAC, monthly floorplan interest charges were due and taken by GMAC on the 10th of the month. As of June 2, 2008, GMAC

33

advised Mr. Eckenhoff that GMAC was unilaterally changing the date the funds were owed and GMAC withdrew the funds a week earlier on June 2, 2008. This action served to further deplete Eckenhoff's cash and stress the business operations at the dealerships at a time when the automotive business nationwide was struggling and Eckenhoff required the cash to satisfy GMAC's unreasonable demands.

85. During the month of June 2008 the Eckenhoff Dealerships continued conducting business and again made the payments requested by GMAC during another weekly round of GMAC audits. Mr. Eckenhoff actively searched for alternate wholesale floorplan financing but, as GMAC was well aware, none was to be found.

86. On July 30, 2008 Mr. Eckenhoff wrote to Todd Paulus of GMAC requesting a 90 day extension of GMAC's threats to terminate his financing. The ninety day extension would extend the financing termination date to November 27, 2008. Mr. Eckenhoff also requested that any alleged "noncompliance" fees ($71,000.00) be postponed until that date. Mr. Eckenhoff advised GMAC that he was actively implementing several alternative plans, including but not limited to, attempting to sell property and obtain investors in order satisfy GMAC's unreasonable demands.

87.  On August 7, 2008, Scott Niday of GMAC wrote to Mr. Eckenhoff in response to Mr. Eckenhoff's letter of July 30, 2008, and confirmed a telephone call of the day before, wherein GMAC agreed to extend the financing termination date until September 30, 2008.  The extension was based upon Mr. Eckenhoff having a plan that resulted in a "1M cash injection", as well as attempting to secure additional investors, a rent moratorium of several months, reduction of GMAC wholesale floorplanned vehicles, and agreement to two increases in his wholesale floorplan interest rate (one in September and one in October). GMAC acknowledged the poor "current, difficult market conditions" yet delivered additional demands and restrictions that were designed to make it even more difficult for the Eckenhoff Dealerships to operate profitably.  GMAC knew its demands were forcing the dealership to abruptly reduce its inventory and compelling Eckenhoff to sell off existing inventory at a loss and also reduce his inventory of used vehicles.

88.  Throughout August and September 2008, Mr. Eckenhoff complied  with the terms set forth within the August 7, 2008 email letter of GMAC.  Mr. Eckenhoff actively attempted to sell real estate, locate investors and otherwise generate additional monies for the dealership.

89.   Mr.   Eckenhoff   requested   that   GM   revisit   its   prior decision not to purchase 808 Old York Road.   Mr. Eckenhoff also inquired   as   to   whether   GM   would   be   willing   to   purchase   back either   the   Cadillac   dealership,   or   the   Buick   Pontiac   GMC dealership.   He also requested that Argonaut Holdings, GMAC's sister-company, provide him with rent abatement for a four month period.    All   of   Mr.   Eckenhoff's   offers   and   requests   for assistance were denied and/or rejected.

90.   At this time, Mr. Eckenhoff also began a series of negotiations   to   sell   Eckenhoff   Jenkintown.        Mr.   Eckenhoff participated in well over one dozen meetings, many conference calls   and   exchanged   sales   data   and   draft   agreements   with   a potential purchaser.   However, due to actions taken by GMAC in October 2008 and December 2008, the sale would never come to fruition.

91.   GMAC   continued   to   raise   Eckenhoff   Jenkintown's interest   rates   and   burdened   the   dealership's   cash   flow   by demanding   additional   "curtailment"   payments   to   further   reduce the amount of vehicle financing provided by GMAC.

92.   Even   though   GMAC   continually   made   demands   on   the Eckenhoff Dealerships that were designed to cripple the finances of   the   dealerships,   the   dealerships   continued   to   operate   and make the payments demanded during the GMAC audits.    GMAC was

forced to take even further drastic action to force the Eckenhoff Dealerships into a financially untenable position.

93. The GM Open Account payments were cash lifeblood of all dealerships during the trying financial times of the fall of 2008. Without these funds, dealerships would face cash flow shortages. GMAC was aware of this and began withholding and not releasing these funds to the Eckenhoff Dealerships.

94. A GM open account payment to Eckenhoff Jenkintown in the amount of $58,148.10 was paid by GM on September 18, 2008. The funds were received by GMAC but were not released by GMAC to Eckenhoff Jenkintown until September 26, 2008, nearly twice the length of time that GMAC had previously withheld such payments. GMAC was aware that the dealership was in need of these funds. Despite GMAC withholding the funds for an extended period of time for no valid reason, Eckenhoff Jenkintown was still able to continue making the payments demanded during the audits, including an audit on September 24, 2008. In turn, GMAC decided to heighten its bad faith conduct toward Eckenhoff Jenkintown by brazenly withholding all future open account payments.

95. GM released an open account payment owed to Eckenhoff on September 30, 2008 in the amount of $36,718.70. GMAC received and withheld these funds without turning them over to Eckenhoff Jenkintown. On October 2, 2008 GM advised that it was releasing another open account payment owed to Eckenhoff in the

amount of $92,780.21.   This payment was also received by GMAC
but was never released to Eckenhoff Jenkintown.   These two
payments equaled $129,498.91.   GMAC had no good faith reason to
withhold the funds from the Eckenhoff Dealerships, especially at
a time when GMAC declared the dealership to be in a "critical"
cash situation.   The Eckenhoff Dealerships were not in default
or out of trust and were timely on all payments to GMAC.
GMAC's actions constituted an abandonment of its good faith
obligations to Eckenhoff Jenkintown and GMAC acted in a manner
that was coercive, unreasonable and in bad faith of the spirit
and the bargain between GMAC and the Eckenhoff Dealerships.

       96.   The financing agreement between GMAC and the Eckenhoff
Dealerships contains the following terms relative to the payment
of floorplan financing:

                We understand that we may sell and lease the vehicles
                at retail in the ordinary course of business. We
                further agree that as each vehicle is sold, or leased,
                we will faithfully and promptly remit to you the
                amount you advanced or have become obligated to
                advance on our behalf to the manufacturer, distributor
                or seller…

                The agreement also states:

                In the event of repossession of the vehicles by GMAC,
                the rights and remedies  applicable under the Uniform
                Commercial Code shall apply.

                **(Exhibit A: Wholesale Security Agreement - Jenkintown)**
                **(Exhibit B: Wholesale Security Agreement - Showcase)**

97.   GMAC's agreements do not contain the terms GMAC sought to enforce against the dealers.   The agreement does NOT state that cars have to be paid off three days after they are "sold".   The Agreement only requires faithful and prompt payment.

98.   At the time period in question, GMAC drastically reduced its participation in consumer leasing of automobiles. As a result, consumers were forced to obtain financing from alternative financial institutions.   These other financial institutions were inundated with lending applications which resulted in a slower turnaround time for consumer financing. That is, banks which approved consumer financing often did not send the dealership the financing funds until weeks after the initial approval and delivery of the vehicles.

99.   GMAC was also aware that at the time in question, GM was delaying rebate payments to its dealership network.   With financing from GMAC being restricted, and payments from GM being delayed by GM, GMAC knew its failure to release nearly $130,000.00 in Open Account payments was making it impossible for the Eckenhoff Dealerships to operate.

100.  Despite the fact that GMAC was withholding significant sums of GM open account payments owed to Eckenhoff Jenkintown, the Eckenhoff Dealership made the payments required by its audit of September 29, 2008 without any problems.

101. The end of September and beginning of October 2008 were good sales periods for Eckenhoff Jenkintown and Eckenhoff Showcase. Together the dealerships were able to begin processing the financing and sale of nearly twenty vehicles in a one week period.

102. On October 6, 2008, while continuing to wrongfully withhold nearly $130,000.00 of Eckenhoff's open account funds, GMAC conducted yet another audit of the Eckenhoff Dealerships.

103. At the end of the October 6, 2008 audit, GMAC demanded the immediate payment of 9 vehicles. Eckenhoff immediately authorized the payment for two of the vehicles for which it had received payment. However, in accordance with the terms of the finance agreements between the Eckenhoff Dealerships and GMAC, GMAC had no basis to demand immediate payment for the other vehicles.

104. In particular, but not by way of limitation, four of the vehicles for which GMAC was demanding immediate payment were vehicles for which financing had been approved by retail financing institutions including GMAC. In fact, GMAC was the company which approved financing for two of the nine vehicles for which GMAC was demanding payment. Not only was GMAC holding nearly $130,000.00 in open account payments from the Eckenhoff Dealerships, GMAC was demanding the immediate payment for cars that GMAC itself had agreed to finance. In total GMAC was

holding the funds the Eckenhoff Dealerships would otherwise use to make the payments demanded by GMAC.

105. The open account funds withheld by GMAC were more than sufficient to cover the floorplan payments costs of the remaining vehicles for which GMAC was demanding immediate payment. It was unreasonable for GMAC to withhold the Eckenhoff Dealership's open account funds and on top of that demand additional payments in excess of the funds being held. GMAC refused to utilize the Eckenhoff Dealership open account funds it was holding to pay off the cars for which it was making immediate demand for payment.

106. GMAC was aware that dealerships which had successful end of the month sales promotions would not have received all financing payments from banks, nor would they have received GM rebates related to the sales within three days of the sales. Furthermore, GMAC was aware that like virtually all GM dealerships at the time, the Eckenhoff Dealerships were facing financial constraints due to the uncertainty surrounding the GM brand. By withholding the dealerships open account funds, refusing to apply those funds to vehicles for which GMAC was demanding payment and insisting upon the immediate payment of vehicles for which financing was not yet received, GMAC acted in a commercially unreasonable and bad faith manner. GMAC's demands and actions represented an abrupt change from its prior

practices and resulted in GMAC fabricating an alleged out-of-trust situation at the Eckenhoff Dealerships.

107. On the night of October 6, 2008 GMAC faxed a document to Mr. Eckenhoff that admitted GMAC was withholding nearly $130,000.00 in open account funds from the Eckenhoff Dealerships.

108. On October 6, 2008, the very same day GMAC was demanding payment on vehicles and for which GMAC was withholding sufficient open account funds and financing, Scott Eckenhoff was finalizing the release of another One Hundred Thousand Dollars ($100,000.00) on a pre-approved working capital loan. Mr. Eckenhoff was doing everything possible to continue to inject funds and capital into his dealerships during the time of an economic crisis. GMAC deliberately and unconscionably acted in a manner intended to make the financial pressures worse for the Eckenhoff Dealerships.

109. GMAC refused to utilize the open account funds it was holding to cure the alleged purported default situation. GMAC did not permit the Eckenhoff Dealerships an opportunity to cure any purported default.

110. At all relevant times herein the Eckenhoff Dealerships were not in default to GMAC on any of their contractual obligations.

111. On the morning of October 7, 2008 Scott Eckenhoff received a facsimile from GMAC titled, "Demand for Immediate Payment at Eckenhoff Buick-Pontiac-GMC-Cadillac, Inc. and Eckenhoff Showcase, Inc. ("Dealerships"). The letter described the purported basis for the manufactured default as Eckenhoff's failure to "promptly pay" GMAC for "certain" unspecified vehicles "sold" by the dealership.

> As you know, the dealership is in default of its obligations to GMAC by failing to **promptly pay the principal amount financed by GMAC** for **certain** motor vehicles which the dealership **has sold**. This situation was **discovered** by us on an audit conducted on October 6, 2008. (Emphasis supplied)

112. The letter makes no mention of the specific vehicles for which payment is purportedly due and specifies no time frame within which the dealership must make payment other than "promptly".

113. GMAC had just completed its most recent inventory audit on September 29, 2008, just six days earlier. Eckenhoff had just made all payments requested by GMAC as of that date. GMAC knew the Eckenhoff Dealerships would be striving to sell as many vehicles as possible between September 29 and early October as part of the customary "End of the Month" sales push made by all dealers. GMAC purposely selected October 6, 2008, a Monday morning, to conduct the next audit knowing that customarily the dealerships would not yet have processed and finalized all of

the paperwork for the "deals" and retail financing from the prior week and weekend sales push.

114. The letter claims the amount allegedly due for the "just sold" vehicles was "discovered" on October 6, 2008. In bad faith, GMAC manufactured the "discovery" of vehicle transactions which it knew would have occurred between the audit of September 29 and the audit of October 6. GMAC knew that as the audit commenced on October 6, the vehicle transactions, including the paper work and financing was still being processed by the sales department, the financing and credit department, as well as the dealerships' bookkeepers and controllers.

115. In fact, GMAC made no "discovery" of default. GMAC knew full well that all dealerships, including the Eckenhoff Dealerships, required variable amounts of time to process paperwork, prepare vehicles, process and finalize retail financing and receive various payments before making payments, with all interest due, to GMAC.

116. GMAC also knew full well that the difficult business climate existing during September-October 2008 was slowing down the dealers' ability to process financing and receive payment for the vehicles in the retail market.

117. Due to the fact GMAC was continuously exercising its right to physically inspect and audit Eckenhoff inventory and vehicle transactions, weekly, GMAC knew precisely how many

44

vehicle transactions were in process and the exact status and value of Eckenhoff's inventory between September 29 and October 6, 2008.

118. GMAC demanded immediate payment for nine (9) vehicles. On October 6, Eckenhoff authorized payment for two (2) of the vehicles, leaving a total of seven (7) vehicle transactions including deals still being processed and finalized.

119. GMAC was advised that four (4) of the remaining seven (7) vehicle transactions involved retail consumer financing already fully approved by financial institutions including GMAC and included vehicles still in process.

120. GMAC was advised that of the remaining three (3) vehicle transactions for which GMAC demanded payment, totaled less than $100,000.00. Thus, at the end of the day on October 6, 2008, GMAC wrongfully declared a "default" involving at most, only nine vehicles, when in fact it knew that only three (3) vehicles remained to be paid and GMAC was already holding nearly $130,000.00 of Eckenhoff's open account funds, clearly more than enough to pay for the remaining vehicles.

121. The letter of October 7, 2008 reflects that GMAC first manufactured the "discovery" of a non-default, exaggerated the number of vehicle transactions at issue, and then literally overnight, demanded immediate full payment for Eckenhoff's entire unsold vehicle inventory of $8,906,382.65; wholesale

interest charges of $50,485.15 and a "Non-Compliance Fee" of $71,985.00. GMAC conceded it was already holding $128,958.91 in Eckenhoff Open Account funds and agreed to apply those funds to the total amount GMAC wrongfully claimed was due.

122. The total amount wrongfully demanded by GMAC was so excessive that even after applying Eckenhoff's Open Account funds, the amount demanded for immediate payment was $9,300,699.92. GMAC demanded the more than Nine Million Dollars be paid within seven (7) days or GMAC would seize all of Eckenhoff's inventory, cash, collateral, and assets.

123. Based solely on an alleged default pursuant to a purported three-day payment policy (not found within the terms of the WSA), GMAC was demanding payment of over $9.3 million by the close of business on October 14, 2008.

124. The October 7, 2008 facsimile was false in that: (a) The Eckenhoff Dealerships were not in default of their respective wholesale financing agreements with GMAC on October 7, 2008, and (b) GMAC did not provide the dealership with the opportunity to cure any alleged default.   The substance and notice of the default letter, along with GMAC's failure to turn over and/or utilize open account funds it was withholding, reflect the unconscionable commercial practices and bad faith of GMAC in creating and declaring a purported default.

125. The October 7, 2008 demand letter inaccurately states that "the dealership's failure to fully cure this default or demonstrate any realistic alternative for solving its longstanding financial problems is unacceptable to GMAC." GMAC did not provide the dealership with an opportunity to "cure" any alleged default. At the time Mr. Eckenhoff received the facsimile, GMAC was holding cash and financing that would have cured any alleged default. Furthermore, Mr. Eckenhoff had access to the $100,000.00 working capital loan which he had signed transfer papers for the day before, and he owned outright many pre-owned vehicles, not floorplanned by GMAC, that could have been sold within 48 hours to generate additional funds to satisfy any amounts due.

126. Mr. Eckenhoff was in constant contact with GMAC representatives. Based upon his long established course of dealings with GMAC, Mr. Eckenhoff was under the erroneous, but reasonable belief that GMAC wanted to work with the Eckenhoff Dealerships in resolving the purported default. Mr. Eckenhoff was unaware that GMAC had decided months earlier to set up the seizure of the Dealerships' inventory regardless of Eckenhoff's efforts to satisfy GMAC's concerns.

127. Immediately upon fabricating and declaring the "default" situation at the Eckenhoff Dealerships, representatives of GMAC began to insist upon the parties

entering into an unconscionable forbearance agreement in order to continue conducting business.    However, as of October 22, 2008, two weeks after GMAC fabricated the "default" situation at the dealerships, GMAC had yet to provide Mr. Eckenhoff with a Forbearance Agreement.

128. Rather than attempt to resolve any purported default, GMAC continued to collect and keep all GM open account funds released to the Eckenhoff Dealerships.  As of October 23, 2008 GM released a total of $204,243.20 which GMAC seized.    GMAC was also aware of the fact that in the first week of November 2008 GM would be sending the Eckenhoff Dealerships a quarterly payment in excess of $200,000.00.  GMAC appeared to be content to draw out discussion of an illusory resolution since GMAC knew it was in position to seize and retain funds in excess $400,000.00.

129. On or around October 27, 2008, GMAC finally provided Mr. Eckenhoff with a proposed Forbearance Agreement.  However, the proposed Agreement stripped away the rights of Mr. Eckenhoff, asked him to admit wrongdoing he was not responsible for, and assessed additional costs and penalties.  Mr. Eckenhoff wrote to GMAC expressing his concerns, including but not limited to, the fact that GMAC seized hundreds of thousands of dollars of open account funds which was not stated or recognized within the Forbearance Agreement.

130. During October and November 2008, GMAC continued its unconscionable commercial practices in an unreasonable and bad faith manner, and was aware that it was effectively putting the Eckenhoff Dealership's out of business. GMAC continued to seize and refuse to release open account funds, refused to release funds that the Dealership's needed for tax and vendor payments, refused the delivery of vehicles and continued to assess additional costs to the Eckenhoff Dealerships.

131. From and after October 7, 2008, GMAC took defacto control of the Eckenhoff Dealerships, seized open account funds, drained cash out of the Dealerships, prevented new and used vehicle sales, impeded trade-ins and effectively prevented the Eckenhoff Dealerships from operating. During October and November of 2008, Mr. Eckenhoff pursued several avenues to generate additional funds including the potential sale of his dealerships.

132. On November 17, 2008 Mr. Eckenhoff received a letter from General Motors confirming that GM was advised that Eckenhoff Jenkintown lost its floorplan financing on October 7, 2008 and that the loss of floorplan financing was a violation of the Eckenhoff Jenkintown Dealer Agreement with General Motors. The letter provided for Mr. Eckenhoff to correct his "breach" within thirty (30) days or GM may elect to terminate his Dealer

Agreement and cease all business relationships with the dealership.

133. On or around December 3, 2008 Todd Paulus of GMAC met with Scott Eckenhoff. Mr. Paulus advised Mr. Eckenhoff that GMAC had made the decision to seize all of the floorplanned vehicles, and that GMAC would be removing all floorplanned vehicles the very next day. Mr. Eckenhoff advised Mr. Paulus that he was close to finalizing the sale of Eckenhoff Jenkintown and asked for a brief additional period to consummate the sales agreements. Mr. Eckenhoff had previously provided GMAC with an outline demonstrating that the pending sale of Eckenhoff Dealerships would permit GMAC to recover all amounts properly due to it and would eliminate the damages and financial ruin Eckenhoff faced if GMAC scuttled the sale by seizing all vehicle inventory. Mr. Eckenhoff further advised that GMAC would suffer no detriment in waiting a brief additional period. Any and all alleged default monies had been repaid in full, and GMAC was well aware of the fact that seizing and selling cars at auction in January and February would bring the lowest possible sales prices. Despite Mr. Eckenhoff's pleas for a few more days to finalize the sale of the dealership, Mr. Paulus did not even bother to make an inquiry with corporate headquarters to see if such an extension was possible. GMAC refused to even consider the reasonable alternatives proposed by Mr. Eckenhoff.

Mr. Paulus told Mr. Eckenhoff that "The decision has been made.".

134. On or around December 4, 2008 GMAC seized all new and used floorplanned vehicles from Eckenhoff Jenkintown and Eckenhoff Showcase, effectively shutting down the dealerships. Rather than continuing to work with Eckenhoff to continue resolving GMAC's purported concerns, GMAC chose actions which would ensure Eckenhoff's financial ruin.

135. The alleged default upon which GMAC accelerated all contractual obligations; terminated all floorplan financing; and seized and sold all dealership inventory thus putting the Eckenhoff Dealerships out of business and causing millions of dollars in damages, was fomented by GMAC's seizure of open account funds and a purported delay of a few days in making vehicle payments. There is no language in the WSA that payment had to be made within three days of sale. There was no default under the WSA and the Eckenhoff Dealerships were not provided any opportunity to cure the alleged default. GMAC lacked a good faith basis to declare a default, demand the immediate payment of over $9.3 million and put the Eckenhoff Dealerships out of business.

136. Had GMAC advised Mr. Eckenhoff that it intended to close down the dealerships irrespective of whether the Dealerships were in default, Mr. Eckenhoff, E Cubed, LLC, and

others, would not have, among other things: (a) depleted personal funds, (b) utilized available credit, (c) injected funds from other sources, including mortgages on real estate, or (d) obtained loans from third parties. GMAC's actions prevented the Dealership from being sold to realize their reasonable and full value, or in the alternative, the Dealerships would have wound down in an organized manner as to maximize the value of the real estate, personality, inventory, parts and to preserve their rights to certain payments from GM, including but not limited to franchise territory termination payments. GMAC's acts and omissions as described herein caused Plaintiffs to lose significant equity in their business interests, and also lost future profits they would have otherwise generated.

137. Had GMAC accurately represented its intentions and permitted an orderly sale or wind down to occur, all amounts owed to GMAC would have been satisfied in full, with interest, the full value of the Eckenhoff Dealerships and real estate investments would have been realized, and Plaintiffs would not have suffered the damages set forth herein.

### GMAC's Bad Faith Conduct and Unconscionable Business Practices

138. GMAC knew but did not disclose to the Eckenhoff Dealerships, or Mr. Eckenhoff, that GMAC had targeted the Eckenhoff Dealerships for termination months earlier and had

decided to seize the Eckenhoff Dealerships vehicle inventories irrespective of whether it was able to cure claimed default under any GMAC wholesale financing agreements.

139. GMAC imposed conditions on the Eckenhoff Dealerships designed to prevent them from operating profitably in the ordinary course of business and performing under the GMAC wholesale financing agreements.

140. GMAC knew, but did not disclose to the Eckenhoff Dealerships, or Mr. Eckenhoff, that GMAC had no intention of allowing the Eckenhoff Dealerships to remain in business even when GMAC demanded increased payments, increased interest, accelerated principal payments, additional working capital, and additional collateral; GMAC knew but did not disclose that it had determined to seize the vehicle inventories and close down the Eckenhoff Dealerships irrespective of whether these additional unreasonable bad faith demands were met.

141. GMAC knew that the Eckenhoff Dealerships were not in default under the wholesale financing agreements, but manufactured a purported default, as a pretext for GMAC to force Mr. Eckenhoff into signing a Forbearance Agreement, close down his business and strip him of cash inventory and other assets.

142. GMAC knew but did not disclose to the Eckenhoff Dealerships, or Mr. Eckenhoff, that it was taking the actions complained of herein so as to increase the cash coffers at GMAC

and address GMAC's own internal liquidity crisis.    It knew but did not disclose that, in the absence of an actual default, GMAC would manufacture one.

### CONSEQUENCES TO MR. ECKENHOFF, THE ECKENHOFF DEALERSHIPS, E CUBED, LLC., and A. THEODORE ECKENHOFF.

143. As a result of the foregoing, the Eckenhoff Dealerships were put out of business, their going concern value entirely lost, and their inventory and other assets sold at a fraction of its value.

144. Had GMAC acted in good faith, advised and alerted Plaintiffs at the outset that it intended to close down the Eckenhoff Dealerships irrespective of whether it was in default, Mr. Eckenhoff would have taken steps to protect his investments in the Dealerships and real estate.

145. Had GMAC acted in good faith and advised Plaintiffs that it intended to close down Eckenhoff Dealerships irrespective of whether they were in default, Plaintiffs would not have depleted personal funds and available credit, would not have obtained and/or made loans for working capital, would not have infused additional working capital into the Dealerships, nor would they have been compelled to liquidate their assets at below market value.    GMAC's misrepresentations, unconscionable commercial practices, and bad faith conduct caused the Eckenhoff

Dealerships to lose significant equity in its business and real estate interests and lose future profits that those business interests and real estate would otherwise have generated.

146. As a result of the foregoing, Plaintiffs' annual income and benefit stream from the Eckenhoff Dealerships was lost, all investments forfeited, and Plaintiffs were forced to incur debt and penalties.

147. As a result of the foregoing, Plaintiffs Scott A. Eckenhoff and Debra A. Eckenhoff were forced to suffer damage to their reputation in the community and severe emotional distress.

148. But for the bad faith misconduct and unconscionable commercial practices of GMAC, loans and funds obtained and invested by Mr. Eckenhoff, the Eckenhoff Dealerships and/or E Cubed, LLC., would have been paid back in full and would not have been depleted and/or properties seized and/or foreclosed upon.

149. But for the bad faith misconduct and unconscionable commercial practices of GMAC, E Cubed, LLC would not have suffered the loss of loans and loss of property and would have otherwise been repaid in full.

150. But for the bad faith misconduct and unconscionable commercial practices of GMAC, the Eckenhoff Dealerships would have remained in business and/or been sold in an orderly fashion and the resulting damages suffered by Plaintiffs (which include

but are not necessarily limited to, the foregoing) would not have occurred.

151. GMAC was well aware that falsely declaring a default and abruptly terminating its floorplan financing with the Eckenhoff dealerships would terminate the Dealership's ongoing contractual relations with GM and destroy the ability of Mr. Eckenhoff to sell the Dealerships and realize their true value.

152. Until GMAC shut down the Dealerships, the Dealerships were in good standing and in compliance with the GM Agreement.

153. Because of GMAC's actions, GM terminated the GM Agreement with Eckenhoff Jenkintown, and their business relationship came to an end. Plaintiff suffered damages as a result.

154. Because GMAC failed to preserve its collateral and allow the Dealerships to remain open and continue to operate, GM declined its obligation to provide financial compensation and assistance to the Dealerships that GM otherwise would have been required to provide under the GM Agreement.

155. GMAC severely damaged Mr. Eckenhoff's business interests by improperly shutting down the Eckenhoff Dealerships for all the reasons set forth above, which foreseeably caused harm to Mr. Eckenhoff's ability to generate income and prevented him from funding and operating his businesses and maintaining his loan obligations for his property interests.

156. GMAC severely damaged Mr. Eckenhoff's business interests by improperly shutting down the Eckenhoff Dealerships for all the reasons set forth above, which foreseeably damaged E Cubed LLC's ability to maintain its loan obligations for its property interests.

157. Because of GMAC's actions, Plaintiffs' lost equity interest in various real estate holdings known to GMAC, including but not limited to properties located in Maple Shade, New Jersey, Cherry Hill, New Jersey, and Jenkintown, Pennsylvania.

158. As a proximate result, the Eckenhoff Dealerships lost everything, as alleged throughout this Complaint, including Dealership assets, franchise rights, territory, inventory, the good-will and going concern value, substantial monies in termination assistance from GM and future lost profits.

159. As a proximate result, Mr. Eckenhoff lost everything, as alleged throughout this Complaint, including his income and benefits from the Dealerships, financial standing, his equity stakes in the dealerships, his interest in his real estate business and properties, future lost profits, his interest in real estate and his ability to repay loans and other obligations.

160. As a proximate result, E Cubed, LLC lost everything as alleged throughout this Complaint, including lost equity interest in real estate and related equity.

161. As a proximate result, Scott A. Eckenhoff now owes substantial sums to individuals, including A. Theodore Eckenhoff, who co-signed or otherwise guaranteed loans taken by Eckenhoff for working capital.

162. The actions of GMAC in this matter were calculated to wrongfully seize and liquidate dealership inventory regardless of the damage to Plaintiffs, and were done with unlawful purpose in willful and wanton disregard that it would cause such damage and loss, without right or justifiable cause on GMAC's part.

163. GMAC's actions in this case constitute improper means and unconscionable commercial practices because they were characterized by bad faith, ill will, malice, fraud, injurious falsehood, misrepresentation, extortion, consumer fraud and threat.

## COUNT ONE

### BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

164. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs by reference.

165. Under the terms of the Wholesale Security Agreement, GMAC agreed to provide floorplan financing to the Eckenhoff Dealerships, at levels and interest rates then in effect, for so long as Eckenhoff Dealerships was not in default and able to cure any default.

166. GMAC had an obligation to act in a commercially reasonable manner and good faith pursuant to the Wholesale Security Agreements. GMAC breached that obligation by manufacturing a purported default as a pretext for seizure of the vehicle inventory and putting the Eckenhoff Dealerships out of business under the guise of financing and security agreement enforcement. By failing to extend funds pursuant to the Wholesale Security Agreement and by arbitrarily restricting and terminating its lending relationship with Plaintiffs, GMAC acted in bad faith and its conduct was not commercially reasonable and constituted unconscionable commercial practices under the circumstances because GMAC did not have a sound good faith basis to assert a default and GMAC knew that Plaintiffs were in full compliance with their contractual obligations. By threatening to withdraw financing unless its unilateral demands were met, GMAC acted in bad faith and its conduct was an unconscionable commercial practice and not commercially reasonable under the circumstances. GMAC knew that it had unilaterally imposed new terms not set forth in the underlying agreements, knew that it

had fixed artificial deadlines for meeting these unilateral demands, and then threatened that if demands were not met within those deadlines, all vehicle inventory would be seized and the business would have to be shut down.

167. The Wholesale Security Agreement specifically incorporates the Uniform Commercial Code ("UCC"), which itself specifically incorporates good faith and fair dealing in every transaction subject thereto, including the duty of a secured party to act in good faith and in a commercially reasonable manner when enforcing remedies thereunder. GMAC's conduct, as alleged herein, has violated those duties.

168. From and after May 28, 2008 GMAC repeatedly breached the Wholesale Security Agreement and it duties of good faith and fair dealing thereunder by, *inter alia*, imposing conditions on Eckenhoff Dealerships and Scott A. Eckenhoff beyond those required under the contracts, impeding their ability to operate in the ordinary course of business, preventing them from meeting those obligations, improperly restricting ongoing floorplan financing of new and used cars, demanding accelerated principal payments, demanding enhanced interest above the contract rate, demanding additional working capital and additional collateral and security, manufacturing a purported default when GMAC knew none existed, misleading Plaintiffs with false promises that Eckenhoff would be permitted cure and to accomplish the

alternative plan Eckenhoff repeatedly outlined to GMAC so as to extract further cash and collateral, misleading Plaintiffs with false promises so as to coerce Plaintiff into signing a Forbearance Agreement under duress, failing to provide Plaintiffs with accounting of funds it received and to where those funds were being applied, and ultimately terminating the Wholesale Security Agreements without cause.

169. Without prior notice and in derogation of its duties of good faith and fair dealing, GMAC notified Plaintiffs on May 28, 2008, that it would be terminating all floorplan financing, and accelerating all amounts due thereunder, even though Plaintiffs were not in default of those loan agreements.

170. On or about May 28, 2008, GMAC breached the Wholesale Security Agreement and its obligation of good faith and fair dealing thereunder by, inter alia, demanding that the outstanding balance be paid, in full, when payment was not due under the terms of the contract and by terminating the agreement without cause.

171. On or about September 2008, GMAC breached the Wholesale Security Agreement and its obligation of good faith and fair dealing thereunder by, inter alia, seizing and refusing to release open account funds to the Eckenhoff Dealerships as it had previously released Eckenhoff's funds in the ordinary course of business.

172. On or about October 7, 2008, GMAC breached the Wholesale Security Agreement and its obligation of good faith and fair dealing thereunder by, inter alia, declaring Eckenhoff Dealerships to be in default when the dealership was not in default, and/or by failing to provide Eckenhoff Dealerships with an opportunity to cure any alleged default claim.

173. As set forth above, GMAC acted in bad faith and in violation of its obligations under the UCC by, *inter alia*, targeting Eckenhoff Dealerships for closure irrespective of whether it was in default, manufacturing a default as a pretext for taking the collateral under the color of Article 9 of the UCC, and forcing the distressed sale of its assets, when GMAC knew from the outset that Eckenhoff Dealerships were not in default.

174. As set forth above, GMAC acted in bad faith and in violation of the UCC, Wholesale Security Agreement and its obligations of good faith and fair dealing thereunder by, *inter alia*, failing to release funds and provide an accounting of seized funds so that Eckenhoff Dealerships could operate its business in a commercially reasonable manner, including but not limited to, the payment of state and federal taxes.

175. As set forth above, GMAC failed to act in a commercially reasonable manner with respect to its collateral by making demands that required: (a) Eckenhoff Dealerships to sell

inventory at below cost at an accelerated rate; (b) sell the dealership assets at a distressed price, and (c) otherwise prevent the orderly sale or disposition of the Dealerships.

176. As a proximate result, Plaintiffs lost everything, as alleged throughout this Complaint, including their income, personal property, assets and equity, financial standing, and benefits from the Eckenhoff Dealerships, including their equity stake in Eckenhoff Dealerships. Further, as a proximate result, Plaintiffs were forced to deplete their personal funds and incur personal debt to third parties to satisfy GMAC's demands. Had GMAC not improperly restricted and terminated the lending relationship, as set forth above, the Eckenhoff Dealerships would have continued to operate profitably, which would have generated substantial profits for Plaintiffs, and the Dealerships could have been sold or operated in an orderly fashion for full value.

177. As a proximate result of GMAC's breach of contract, its breach of implied covenant of good faith and fair dealing, and its failure to act in a commercially reasonable manner, Plaintiffs were damaged by GMAC in an amount to be determined at trial.

178. The intentional and outrageous conduct of GMAC warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count One for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs

## COUNT TWO

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

179. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs by reference.

180. At all relevant times, Eckenhoff Jenkintown and GM were parties to a General Motors Dealer Sales and Service Agreement (the "GM Agreement"), pursuant to which GM authorized Eckenhoff Jenkintown to conduct the retail sale of numerous lines of GM cars and trucks. Under the GM Agreement, Eckenhoff Jenkintown was also authorized to perform warranty service and repair on GM vehicles, and sell GM parts.

181. At all relevant times, Eckenhoff Jenkintown was a successful GM dealership in the Commonwealth of Pennsylvania.

182. At no time did GM notify Eckenhoff Jenkintown or Scott A. Eckenhoff that it wished to terminate the GM Agreement or that it planned to close down the Eckenhoff Dealerships.

183. GMAC was well aware that alternative floorplan financing to replace the GMAC financial products was unavailable in the financial marketplace at the time it abruptly terminated its lending relationship with Eckenhoff Jenkintown.

184. GMAC was well aware that abruptly terminating its lending relationship with Eckenhoff Jenkintown would interfere with the dealership's ongoing contractual relations with GM and destroy its business relationship with GM.  GMAC's actions, as described above, were purposeful and in willful and wanton disregard of the harm to the existing relationship between GM and Eckenhoff Jenkintown.

185. GMAC's actions as described above were done in the absence of privilege or justification.

186. Until GMAC shut down the Eckenhoff Dealerships, Eckenhoff Jenkintown was in good standing and in full compliance with the GM Agreement.

187. GMAC directly interfered with Eckenhoff Jenkintown's business relationship with GM and its rights under the GM Agreement.

188. As a result of GMAC's actions, GM terminated the GM Agreement with Eckenhoff Jenkintown causing damage as complained of herein to Plaintiffs.

189. Additionally, because GMAC refused to allow Eckenhoff Jenkintown to cure, remain open, and continue to operate, GM

declined its obligation to provide the financial compensation and assistance to Eckenhoff Jenkintown that GM otherwise would have been required to provide to Eckenhoff Jenkintown under the GM Agreement for the benefit of Eckenhoff Jenkintown. But for GMAC's conduct, that financial compensation and assistance paid by GM to Eckenhoff Jenkintown under the GM Agreement would have been at least multiple hundreds of thousands of dollars.

190. As a proximate result, Eckenhoff Jenkintown lost everything, as alleged throughout this Complaint, including the good-will and going concern value of those dealership points plus hundreds of thousands of dollars in termination assistance from GM.

191. The actions of GMAC in this case were calculated to cause damage to Eckenhoff Jenkintown in its lawful business, and were done with the unlawful purpose to cause such damage and loss, without the right or justifiable cause on GMAC's part.

192. GMAC's actions in this case constitute improper means because they were characterized by ill will, malice, fraud, injurious falsehood, extortion, unconscionable commercial practices, consumer fraud, and the threatened destruction of Eckenhoff Jenkintown's business unless GMAC's unreasonable demands were met.

193. Eckenhoff of Jenkintown did not learn, and with appropriate due diligence could not have known, of GMAC's scheme

to target Eckenhoff Jenkintown and other dealers and its true intention to shut down the dealership regardless of its compliance with GMAC's demands, until the fall of 2010.

194. As a proximate result of GMAC's actions, all of which were committed with actual malice, Eckenhoff Jenkintown suffered and will continue to suffer economic injury in an amount to be determined at trial, including but not limited to lost profits, and loss of good will and reputation and other damages.

195. As a proximate result of GMAC's actions, all of which were committed with actual malice, the Eckenhoff Dealerships suffered and will continue to suffer economic injury in an amount to be determined at trial.

196. The intentional and outrageous conduct of GMAC warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Two for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## COUNT THREE
### FRAUD

197. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs by reference.

198. The statements and representations made by GMAC and/or its agents, servants and/or employees to the Plaintiffs regarding the validity of constantly changing terms for conducting business and the existence of a default under the GMAC loan agreements constituted false representations of material facts. GMAC and/or GMAC's agents, servants, and/or employees knew that these representations were false when they were made and that GMAC had manufactured a purported default so that GMAC could seize the vehicle inventory and terminate the lending relationship.

199. GMAC's statements and representations were made with the intention of defrauding Plaintiffs. These statements and representations of GMAC and/or GMAC's agents, servants, and/or employees were made with the intent of having Plaintiffs act and rely upon them.

200. Plaintiffs actually and justifiably relied on the aforementioned representations of fact by GMAC and/or GMAC's agents, servants and/or employees and, as a result of such reasonable reliance, Scott A. Eckenhoff and E Cubed, LLC

injected additional significant working capital into the dealership.

201. GMAC led Mr. Eckenhoff to believe that, if additional funds, working capital, and security were invested in the dealership and provided to GMAC, GMAC would allow Eckenhoff Dealerships to continue to operate in the ordinary course of business. However, GMAC knew from the outset, but knowingly failed to disclose, that it had targeted Eckenhoff Dealerships for termination irrespective of whether the additional investments were made.

202. Further, as alleged herein in detail, from the outset, GMAC knew but did not disclose to the Plaintiffs material facts, including but not limited to the following: (1) GMAC had targeted Eckenhoff Dealerships for termination months earlier and had decided to seize the vehicle inventory and close down Eckenhoff Dealerships' business, irrespective of whether it was in default under any of the GMAC loan agreements; (2) the conditions imposed on Eckenhoff Dealerships were designed to prevent it from performing profitably under the GMAC financing agreements; (3) GMAC had no intention of allowing Eckenhoff Dealerships to remain in business when it demanded and extracted increased payments, interest, accelerated principal payments, additional working capital, additional collateral, and exerted bad faith financial pressure to coerce the execution of

unconscionable    Forbearance    Agreements;    (4)    GMAC    would manufacture a purported default as a pretext for GMAC to seize the vehicle inventory and close down the Eckenhoff Dealerships and trick the Eckenhoff Dealerships out of cash and assets; and (5) GMAC was making the demands complained of herein so as to increase    the    cash    coffers    at    GMAC    and    address    GMAC's    own internal liquidity crisis.

203. GMAC had a duty to disclose the above material facts to Plaintiffs, so that Plaintiffs could conduct business in an orderly and profitable manner, and it breached that duty by failing to do so.

204. GMAC intended that its concealment of these material facts    would    mislead    the    Plaintiffs    into    the    mistaken    but reasonable belief that, if they acceded to GMAC's monetary and other demands, GMAC would not abruptly terminate their lending relationship and would allow them to resolve the alleged default and    stay    in    business    in    accordance    with    the    alternative financial plan repeatedly outlined to GMAC by Mr. Eckenhoff.

205. GMAC failed to disclose these material facts with the intention of defrauding the Plaintiffs and with the intent of having    the    Plaintiffs    act    and    rely    upon    the    false representations and material omissions of GMAC.

206. Plaintiffs justifiably relied on GMAC's intentional concealment,    omissions,    and    non-disclosure    of    these    material

facts in continuing to invest in the business and acceding to GMAC's monetary and other demands as set forth above.

207. Had Plaintiffs known these material facts, they would have curtailed investments in the business and would not have acceded to GMAC's demands, Eckenhoff of Jenkintown would have remained a Motors Holding Company, Scott Eckenhoff would not have mortgaged his home and diverted funds needed for the operation of his business, E Cubed, LLC would not have mortgaged properties and loaned monies to the Eckenhoff Dealerships, and he would have remained in business and/or orchestrated an orderly wind down of the Eckenhoff Dealerships to realize its reasonable and full value before GMAC abruptly terminated all financing and shut the Eckenhoff Dealerships down.

208. Plaintiffs did not learn until the fall of 2010, and with appropriate due diligence could not have known, of GMAC's scheme to target dealers and its true intention to shut down the Eckenhoff Dealerships regardless of Plaintiffs' compliance with its demands.

209. GMAC's statements, representations, and/or omissions constitute acts of malice, vindictiveness, and/or a wholly wanton disregard of the rights of Plaintiffs.

210. As a proximate result of Plaintiffs' reliance on the misrepresentations and/or omissions of GMAC and/or GMAC's agents, servants, and/or employees, Plaintiffs suffered and will

continue to suffer economic damage and injury in an amount to be determined at trial.

211. As a further proximate result of GMAC's actions, Scott A. Eckenhoff and Debra A. Eckenhoff suffered humiliation, embarrassment, emotional pain and anguish and other non-economic damages in an amount to be determined at trial.

212. The outrageous conduct of GMAC warrants an award of punitive damages in favor of Plaintiffs, and damages for emotional pain and suffering in favor of Mr. Eckenhoff.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Three for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## COUNT FOUR
### NEGLIGENT MISREPRESENTATION

213. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs by reference.

214. GMAC owed a duty of care to the Plaintiffs and negligently asserted false statements and negligently made misleading statements and omissions, as set forth above.

215. GMAC intended or knew that Plaintiffs would rely upon its false statements, material omissions, and misleading statements, which would cause loss or injury to the Plaintiffs.

216. Plaintiffs justifiably relied on GMAC's false statements and misleading non-disclosures.

217. In justifiable reliance on GMAC's false statements and misleading non-disclosures, Plaintiffs took the actions set forth above, which caused actual loss and injury to Plaintiffs.

218. GMAC's actions and/or omissions constitute acts of malice, vindictiveness, and/or wholly wanton disregard of the rights of Plaintiffs.

219. Plaintiffs did not learn, and with appropriate due diligence could not have known, of GMAC's scheme to target dealers and its true intention to shut down Eckenhoff Dealerships regardless of Plaintiff's compliance with its demands until the fall of 2010.

220. As a proximate result of GMAC's negligent misrepresentations and misleading non-disclosures, Plaintiffs suffered and will continue to suffer economic injury in an amount to be determined at trial.

221. As a further proximate result of GMAC's actions, Eckenhoff Dealerships and Scott A. Eckenhoff suffered humiliation, embarrassment, emotional pain and anguish and other non-economic damages in an amount to be determined at trial.

222. The outrageous conduct of GMAC warrants an award of punitive damages in favor of the Plaintiffs, and damages for emotional pain and suffering on part of Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Four for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## COUNT FIVE
### INTENTIONAL MISREPRESENTATION

223. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs by reference.

224. GMAC owed a duty of care to the Plaintiffs and intentionally asserted false statements and intentionally made misleading statements and omissions, as set forth above.

225. GMAC intended or knew that Plaintiffs would rely upon its false statements, material omissions, and misleading statements, which would cause loss or injury to the Plaintiffs.

226. Plaintiffs justifiably relied on GMAC's false statements and misleading non-disclosures.

227. In justifiable reliance on GMAC's false statements and misleading non-disclosures, Plaintiffs took the actions set forth above, which caused actual loss and injury to Plaintiffs.

228. GMAC's actions and/or omissions constitute acts of malice, vindictiveness, and/or wholly wanton disregard of the rights of Plaintiffs.

229. The statements and representations made by GMAC and/or GMAC's agents, servants, and/or employees to the Eckenhoff Dealerships and to Mr. Eckenhoff regarding the existence of a default under the GMAC loan agreements also constituted false representations of material facts.  GMAC and/or GMAC's agents, servants, and/or employees knew that these representations were false when they were made and that GMAC had manufactured a purported default so that GMAC could terminate the lending relationship.

230. Plaintiffs did not learn, and with appropriate due diligence could not have known, of GMAC's scheme to target dealers and its true intention to shut down Eckenhoff Dealerships regardless of Plaintiff's compliance with its demands until the fall of 2010.

231. As a proximate result of GMAC's intentional misrepresentations and misleading non-disclosures, Plaintiffs suffered and will continue to suffer economic injury in an amount to be determined at trial.

232. As a further proximate result of GMAC's actions, Eckenhoff Dealerships and Scott A. Eckenhoff suffered humiliation, embarrassment, emotional pain and anguish and other non-economic damages in an amount to be determined at trial.

233. The outrageous conduct of GMAC warrants an award of punitive damages in favor of the Plaintiffs, and damages for emotional pain and suffering on part of Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Five for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## COUNT SIX
### NEW JERSEY CONSUMER FRAUD ACT

234. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs herein by reference.

235. The conduct and actions of GMAC and it's individual representative, as set forth in all preceding paragraphs herein, is herein repeated within this count and constitutes unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing concealment, suppression, or omission of material fact with

intent that others, specifically Plaintiffs, and others similarly situated individual, entities, and automobile dealerships would rely upon such concealment, suppression or omission, in connection with the sale of GMAC's financing products, financing merchandise, or financing services. The conduct and actions of GMAC and its individual representatives constituted violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to 20.

236. Plaintiffs thereby demand full restitution, treble damages, payment of counsel fees and all damages and recovery permitted under the New Jersey Consumer Fraud Act.

237. As a proximate result of GMAC's violation of the New Jersey Consumer Fraud Act, Plaintiffs suffered and will continue to suffer economic injury and damage in an amount to be determined at trial.

238. As a proximate result of GMAC's actions, all of which were committed with actual malice, the Eckenhoff Dealerships suffered and will continue to suffer economic injury in an amount to be determined at trial.

239. The intentional and outrageous conduct of GMAC warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Six for compensatory damages, including consequential damages, in the

amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## COUNT SEVEN
### CONVERSION
### (The Eckenhoff Dealerships v. GMAC)

240. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this Complaint and incorporate such paragraphs herein by reference.

241. GMAC committed acts of conversion when they unilaterally and unlawfully seized the Eckenhoff Dealerships' accounts, vehicle inventory, open account payments, and proceeds from the sale of new and used vehicles without justification.

242. GMAC exercised dominion wrongfully over the Dealerships' personal property in a manner that was inconsistent with the title and rights of Plaintiffs and in derogation, exclusion, and defiance of Plaintiffs' rights thereto.

243. GMAC is liable for the full value of the property improperly converted and should be held liable for the damage proximately caused by its unlawful acts.

244. The actions of GMAC in improperly converting the Eckenhoff Dealerships' property were calculated to cause damage to the Eckenhoff Dealerships in their lawful business, and done

with the unlawful purpose to cause such damage and loss, without the right or justifiable cause on GMAC's part.

245. As a proximate result of GMAC's actions, all of which were committed with actual malice, the Eckenhoff Dealerships suffered and will continue to suffer economic injury in an amount to be determined at trial.

246. The intentional and outrageous conduct of GMAC warrants an award of punitive damages.

**WHEREFORE**, Plaintiffs respectfully request this Court to enter judgment against Ally Financial Inc., on Count Seven for compensatory damages, including consequential damages, in the amount of $20,000,000.00, plus treble damages, plus interest accrued thereon, together with punitive damages, attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court to enter Judgment against GMAC:

1.   Compensatory damages, including consequential damages;

2.   Punitive Damages;

3.   Treble damages;

4.   Interest;

5.   Attorneys Fees;

6.   Damages for Scott and Debra Eckenhoff's pain and
     suffering; and

7.   Such other and further relief as this Court shall deem
     fair and just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs   Scott   A.   Eckenhoff,   Debra   A.   Eckenhoff,
Eckenhoff Buick Pontiac GMAC Cadillac, Inc., Eckenhoff Showcase,
Inc., and E Cubed, LLC demands a trial by jury of all issues.


MACLACHLAN LAW OFFICES, LLC
Attorneys for Plaintiffs

BY: _____
     Donald S. MacLachlan


BY: _____
     Philip S. Tarr


Dated: May 28, 2012

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to L. Civ. R. 11.2, the undersigned attorneys for the Plaintiffs certify that, to the best of their knowledge, the matter in controversy is not the subject of any other action pending in any court or of any arbitration or administrative proceeding.

## CERTIFICATION OF NON-ARBITRABILITY

Pursuant to L. Civ. R. 201.1(d)(2), the undersigned attorneys for the Plaintiffs certify that, this action is not eligible for arbitration under Local Civil Rule 201.1 because the relief sought in the Complaint primarily consists of a demand for damages believed to be in excess of $150,000.00, exclusive of interest, costs, and any claim for punitive damages.

MACLACHLAN LAW OFFICES, LLC
Attorneys for Plaintiffs

BY: _____
Donald S. MacLachlan


BY: _____
Philip S. Tarr

Dated: May 28, 2012

**EXHIBIT A**

# WHOLESALE SECURITY AGREEMENT

To: General Motors Acceptance Corporation (GMAC)

In the course of our business, we acquire new and used cars, trucks and chassis ("Vehicles") from manufacturers or distributors. We desire you to finance the acquisition of such vehicles and to pay the manufacturers or distributors therefor.

We agree upon demand to pay to GMAC the amount it advances or is obligated to advance to the manufacturer or distributor for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan.

We also agree that to secure collectively the payment by us of the amounts of all advances and obligations to advance made by GMAC to the manufacturer, distributor or other sellers, and the interest due thereon, GMAC is hereby granted a security interest in the vehicles and the proceeds of sale thereof ("Collateral") as more fully described herein.

The collateral subject to this Wholesale Security Agreement is new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease, and all vehicles of like kinds or types now owned or hereafter acquired from manufacturers, distributors or sellers by way of replacement, substitution, addition or otherwise, and all additions and accessions thereto and all proceeds of such vehicles, including insurance proceeds.

Our possession of the vehicles shall be for the purpose of storing and exhibiting same for retail sale in the regular course of business. We shall keep the vehicles brand new and we shall not use them illegally, improperly or for hire. GMAC shall at all times have the right of access to and inspection of the vehicles and the right to examine our books and records pertaining to the vehicles.

We agree to keep the vehicles free of all taxes, liens and encumbrances, and any sum of money that may be paid by GMAC in release or discharge thereof shall be paid to GMAC on demand as an additional part of the obligation secured hereunder. We shall not mortgage, pledge or loan the vehicles and shall not transfer or otherwise dispose of them except as next hereinafter more particularly provided. We shall execute in favor of GMAC any form of document which may be required for the amounts advanced to the manufacturer, distributor or seller, and shall execute such additional documents as GMAC may at any time request in order to confirm or perfect title or security in the vehicles. Execution by us of any instrument for the amount advanced shall be deemed evidence of our obligation and not payment therefor. We authorize GMAC or any of its officers or employees or agents to execute such documents in our behalf and to supply any omitted information and correct patent errors in any document executed by us.

We understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that as each vehicle is sold, or leased, we will, faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC Wholesale Plan. The GMAC Wholesale Plan is hereby incorporated by reference.

GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by us until such proceeds are accounted for as aforesaid, and to the proceeds of any other disposition of said vehicles or any part thereof.

In the event we default in payment under and according to this agreement, or in due performance or compliance with any of the terms and conditions hereof, or in the event of a proceeding in bankruptcy, insolvency or receivership instituted by or against us or our property, or in the event that GMAC deems itself insecure or said vehicles are in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said vehicles, without demand or further notice and without legal process; for the purpose and in furtherance thereof, we shall, if GMAC so requests, assemble said vehicles and make them available to GMAC at a reasonable convenient place designated by it, and GMAC shall have the right, and we hereby authorize and empower GMAC, to enter upon the premises wherever said vehicles may be and remove same. We shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorney's fees and legal expenses, in connection with GMAC's exercise of any of its rights and remedies under this agreement.

In the event of repossession of the vehicles by GMAC, then the rights and remedies applicable under the Uniform Commercial Code shall apply.

Any provision hereof prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative this _____14ᵗʰ_____ day of _____December_____ 2004.

Witness and Attest:

Eckenhoff    Buick-Pontiac-GMC-Cadillac, Inc.

_____

By: _____

Accepted
General Motors Acceptance Corporation

Its: _____President_____

By: _____
    Its Authorized Agent

555 Business Center Dr., Horsham, PA 19044

1750 The Fairway Jenkintown Pennsylvania 19046

GMAC 171 Wholesale Security Agreement

# EXHIBIT B

# WHOLESALE SECURITY AGREEMENT

**To: GMAC**

In the course of our business, we acquire new and used cars, trucks and chassis ("Vehicles") from manufacturers or distributors. We desire you to finance the acquisition of such vehicles and to pay the manufacturers or distributors therefor.

We agree upon demand to pay to GMAC the amount it advances or is obligated to advance to the manufacturer or distributor for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan.

We also agree that to secure collectively the payment by us of the amounts of all advances and obligations to advance made by GMAC to the manufacturer, distributor or other sellers, and the interest due thereon, GMAC is hereby granted a security interest in the vehicles and the proceeds of sale thereof ("Collateral") as more fully described herein.

The collateral subject to this Wholesale Security Agreement is new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease, and all vehicles of like kinds or types now owned or hereafter acquired from manufacturers, distributors or sellers by way of replacement, substitution, addition or otherwise, and all additions and accessions thereto and all proceeds of such vehicles, including insurance proceeds.

Our possession of the vehicles shall be for the purpose of storing and exhibiting same for retail sale in the regular course of business. We shall keep the vehicles brand new and we shall not use them illegally, improperly or for hire. GMAC shall at all times have the right of access to and inspection of the vehicles and the right to examine our books and records pertaining to the vehicles.

We agree to keep the vehicles free of all taxes, liens and encumbrances, and any sum of money that may be paid by GMAC in release or discharge thereof shall be paid to GMAC on demand as an additional part of the obligation secured hereunder. We shall not mortgage, pledge or loan the vehicles and shall not transfer or otherwise dispose of them except as next hereinafter more particularly provided. We shall execute in favor of GMAC any form of document which may be required for the amounts advanced to the manufacturer, distributor or seller, and shall execute such additional documents as GMAC may at any time request in order to confirm or perfect title or security in the vehicles. Execution by us of any instrument for the amount advanced shall be deemed evidence of our obligation and not payment therefor. We authorize GMAC or any of its officers or employees or agents to execute such documents in our behalf and to supply any omitted information and correct patent errors in any document executed by us.

We understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that as each vehicle is sold, or leased, we will, faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC Wholesale Plan. The GMAC Wholesale Plan is hereby incorporated by reference.

GMAC's security interest in the vehicles shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any retail sale or lease thereof by us until such proceeds are accounted for as aforesaid, and to the proceeds of any other disposition of said vehicles or any part thereof.

In the event we default in payment under and according to this agreement, or in due performance or compliance with any of the terms and conditions hereof, or in the event of a proceeding in bankruptcy, insolvency or receivership instituted by or against us or our property, or in the event that GMAC deems itself insecure or said vehicles are in danger of misuse, loss, seizure or confiscation, GMAC may take immediate possession of said vehicles, without demand or further notice and without legal process; for the purpose and in furtherance thereof, we shall, if GMAC so requests, assemble said vehicles and make them available to GMAC at a reasonable convenient place designated by it, and GMAC shall have the right, and we hereby authorize and empower GMAC, to enter upon the premises wherever said vehicles may be and remove same. We shall pay all expenses and reimburse GMAC for any expenditures, including reasonable attorney's fees and legal expenses, in connection with GMAC's exercise of any of its rights and remedies under this agreement.

In the event of repossession of the vehicles by GMAC, then the rights and remedies applicable under the Uniform Commercial Code shall apply.

Any provision hereof prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by its duly authorized representative this _____ day of _____ 2007.

Witness and Attest:

_____

Accepted:
**GMAC**

By: _____
William P. O'Neal   Assistant Secretary

**555 Business Center Dr., Horsham, PA  19044**

Eckenhoff Showcase, Inc.

By: _____
Scott Eckenhoff

Its:   President

**483 Route 38 West, Maple Shade, NJ 08052**

GMAC 17T Wholesale Security Agreement